*Local Rule 81*

*Local Rules of Civil Procedure of the Western District of New York*

**Index of Documents Filed or Served in the
New York State Court Action**

| Exhibit | Document | Date Filed and/or Served |
|---------|----------|--------------------------|
| **BB** | Summons & Verified Complaint | September 1, 2021 (filed)<br><br>On or about November 17, 2021 (received: Todd Baxter)<br><br>November 29, 2021 (served: City of Rochester, Geoffrey Quinn, Tyler Couch, and Matthew Webster) |

EXHIBIT BB

MONROE COUNTY CLERK'S OFFICE                THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2829677

Book    Page    CIVIL

Return To:                                  No. Pages: 34
ELLIOT DOLBY-SHIELDS
192 Lexington Avenue, Suite 802             Instrument: EFILING INDEX NUMBER
New York, NY 10016

Control #:        202109020023
Index #:          E2021008170

Date: 09/02/2021

Sadwick, Alyssa                             Time: 8:36:44 AM

The City of Rochester
Quinn, Geoffrey
Couch, Tyler
Webster, Matthew
Baxter, Todd

| | | |
|---|---|---|
| State Fee Index Number | $165.00 | |
| County Fee Index Number | $26.00 | |
| State Fee Cultural Education | $14.25 | |
| State Fee Records Management | $4.75 | Employee: CW |

Total Fees Paid:          $210.00

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK



**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF MONROE**

| | |
|---|---|
| ALYSSA SADWICK,<br><br>                               Plaintiff,<br><br>-against-<br><br>THE CITY OF ROCHESTER, a municipal entity, GEOFFREY QUINN, TYLER COUCH, MATTHEW WEBSTER, "JOHN DOE" ROCHESTER POLICE DEPARTMENT OFFICERS "1–200", (names and number of whom are unknown at present), TODD BAXTER, "RICHARD ROE SHERIFF'S DEPUTIES 1-200" (names and number of whom are unknown at present), and other unidentified members of the Rochester Police Department and Monroe County Sheriff's Office,<br><br>                              Defendants. | **SUMMONS**<br><br>Index No.:<br><br>The basis of venue is:<br>Location of the incident<br><br>Plaintiff designates Monroe County as the place of trial. |

**To the above named Defendants:**

**You are hereby summoned** to answer the complaint in this action, and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiff's attorneys within twenty days after the service of this summons, exclusive of the day of service, where service is made by delivery upon you personally within the state, or, within 30 days after completion of service where service is made in any other manner. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

DATED: New York, New York
       September 1, 2021

Yours, etc.,

ROTH & ROTH, LLP.
ELLIOT SHIELDS, ESQ.
Attorney for Plaintiff
192 Lexington Ave, Suite 802
New York, New York 10016
(212) 245-1020

EASTON THOMPSON
KASPEREK SHIFFRIN LLP
Donald Thompson

16 West Main Street, Suite 243
Rochester, New York 14614
Ph: (585) 423-8290


TO:
CITY OF ROCHESTER
CORPORATION COUNSEL
30 Church Street
Rochester, New York 14614

COUNTY OF MONROE
Monroe County Law Department
307 County Office Building
39 W. Main St.
Rochester, NY 14614

GEOFFREY QUINN, TYLER COUCH, MATTHEW WEBSTER
185 Exchange Blvd.
Rochester, New York, 14614

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF MONROE**

ALYSSA SADWICK,

                                        Plaintiff,

                    -against-

THE CITY OF ROCHESTER, a municipal entity,
GEOFFREY QUINN, TYLER COUCH, MATTHEW
WEBSTER, "JOHN DOE" ROCHESTER POLICE
DEPARTMENT OFFICERS "1–200", (names and number of
whom are unknown at present), TODD BAXTER,
"RICHARD ROE SHERIFF'S DEPUTIES 1-200" (names
and number of whom are unknown at present), and other
unidentified members of the Rochester Police Department and
Monroe County Sheriff's Office,

                                        Defendants.

INDEX NO.:

**VERIFIED COMPLAINT**
**[JURY TRIAL DEMANDED]**

Plaintiff, by her attorneys, ROTH & ROTH, LLP and EASTON THOMPSON

KASPAREK SHIFFRIN LLP, complaining of the defendants, respectfully allege as follows:

## I.      **PARTIES**

1.      Plaintiff ALYSSA SADWICK is a resident of the City of Rochester, State of New

York.

2.      Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and

authorized under the laws of the State of New York. It is authorized by law to maintain a police

department, which acts as its agent in the area of law enforcement and for which it is ultimately

responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force

and the employment of police officers as said risks attach to the public consumers of the services

provided by the RPD.

3.      Defendant CITY OF ROCHESTER ("CITY") was and is a municipal corporation

duly organized and existing under and by virtue of the laws of the State of New York. Defendant

CITY maintains the City of Rochester Police Department, a duly authorized police department,

authorized to perform all functions of a police department. RPD acts as Defendant, CITY's agent and Defendant CITY assumes the risks incidental to the maintenance of a police department and the employment of police officers.

4.      GEOFFREY QUINN, TYLER COUCH, MATTHEW WEBSTER, "JOHN DOE" ROCHESTER POLICE DEPARTMENT OFFICERS "1–200" (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Police Officers with the RPD. At all relevant times, these defendants were acting within the scope of their employment with the CITY and RPD and under color of state law. They are sued in their individual capacities. John Doe RPD Officers are referred to collectively as "the RPD officers."

5.      Defendant TODD BAXTER ("Sheriff Baxter" or "BAXTER") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. At all relevant times, Defendant BAXTER was acting within the scope of his employment and under color of state law. He is sued in his individual and official capacity.

6.      "RICHARD ROE" MONROE COUNTY SHERIFF'S DEPUTIES "1–200" (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Deputy Sheriffs with the Monroe County Sheriff's Office ("MCSO"). At all relevant times, these defendants were acting within the scope of their employment with the County and under Sheriff BAXTER and acting under color of state law. They are sued in their individual capacities. They are referred to collectively as "the Sheriff's Deputies."

7.      BAXTER is responsible for the training, supervision and discipline of the Defendant Sheriff's Deputies under state law.

## II. JURISDICTION

8.      This action falls within one or more of the exceptions as set forth in CPLR

Section 1602, involving intentional actions, as well as the defendant, and/or defendants, having

acted in reckless disregard for the safety of others, as well as having performed intentional acts.

9.      Ms. SADWICK sustained damages in an amount in excess of the jurisdictional

limits of all the lower Courts of the State of New York.

10.     Ms. SADWICK filed timely Notices of Claim against the City and County, in

compliance with the Municipal Law § 50.

11.     The CITY and County held a 50-h hearing on May 18, 2021.

12.     More than thirty (30) days have elapsed since service of said Notices of Claim

were filed and the City and County have failed to pay or adjust the claim.

13.     This action is being brought within a year of the event that gives rise to Ms.

SADWICK's causes of action under New York State law and Plaintiffs have complied with all

of the statutory prerequisites for bringing this action.

### III.  STATEMENT OF FACTS

**A.  July 5, 2020 Incident (Only Involving the City and RPD Officers).**

14.     Plaintiff hosted a 4th of July party on July 4-5, 2020 at her home at 261

Pennsylvania Avenue, Rochester, New York.

15.     At approximately 2:00 a.m. on July 5, 2020, Plaintiff and her friends heard her

neighbors yelling, and so they went to investigate.

16.     When Plaintiff and her friends arrived at 287 Pennsylvania Avenue, they

discovered that RPD officers, including QUINN, COUCH and WEBSTER had arrested and were

being physically aggressive with two of her neighbors who had called 911 for help for a young

man who was injured in a different area of the City.

17.     Upon information and belief, the young man who was injured in another part of the City had ridden his bike past 287 Pennsylvania Avenue when he saw Plaintiff's neighbors and asked them for help.

18.     Upon information and belief, Plaintiff's neighbors and the victim informed the RPD officers that the victim was injured in another part of the City.

19.     Plaintiff's neighbors stated to the police that, "we called you for help and this is how you are treating us?"

20.     Plaintiff's neighbors called out to Plaintiff and her friends for help.

21.     Plaintiff and her friends attempted to video record the RPD officers, including QUINN, COUCH and WEBSTER, because they appeared to be using excessive force against her neighbors.

22.     Plaintiff complied with RPD officers' orders to move back to her property.

23.     At approximately 2:20 a.m., while she was standing in her own front yard, QUINN violently and unlawfully seized Plaintiff, without cause or justification.

24.     QUINN then violently body slammed Plaintiff onto the ground, without cause or justification.

25.     QUINN, COUCH, WEBSTER and other RPD officers then placed handcuffs on her wrists in an unreasonably tight manner.

26.     Plaintiff was arrested and placed into an RPD vehicle, where she was detained by for several hours before she was given an appearance ticket and released from custody.

27.     QUINN falsely charged Plaintiff with several counts of Disorderly Conduct.

28.     At no time did Plaintiff commit any crime or violation or threaten police officers.

29.     QUINN, COUCH, WEBSTER and other RPD officers lacked reasonable or probable cause to seize or arrest Plaintiff.

30.     Plaintiff accepted an Adjournment in Contemplation of Dismissal on October 2, 2020, and all the false criminal charges have since been dismissed and sealed.

### B.  Facts Common to All Causes of Action Related to September 2-6, 2020 Protests.

31.     On March 23, 2020, Daniel Prude's family sought help from the Rochester Police Department ("RPD") as Daniel was suffering an acute mental health crisis. Tragically, that call for help ended with Daniel naked and handcuffed with his face covered by a "spit hood," as an RPD officer pushed his head into the freezing asphalt for several minutes. RPD officers on the scene mocked Daniel and chatted with each other while he asphyxiated. Daniel was declared brain dead that night; he was taken off life support and died on March 30.

32.     When the video of RPD Officers killing Daniel Prude was finally made public on September 2, 2020, it sparked nationwide outrage. In Rochester, thousands of people gathered to mourn the loss of Black lives, demand the CITY finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives.

33.     On September 2-6, 2020, the defendants responded to peaceful protests with extreme violence—including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly "less-than-lethal" munitions.

34.     Chemical weapons, like tear gas, are banned in warfare because they are indiscriminate weapons by design, especially when deployed by firing a grenade or canister. Chemical Weapons can cause severe injury or death, and, even at low concentrations, exposure to tear gas presents a risk of serious, irreversible health effects.

35.    For Ms. SADWICK, exposure to the chemical weapons on September 2-6, 2020 by Defendants caused menstrual irregularities.

**Wednesday September 2, 2020**

36.    Plaintiff was assaulted and battered by RPD officers and/or Sheriff's Deputies on Wednesday September 2, 2020, at a peaceful protest in front of the Public Safety Building ("PSB").

37.    When she arrived, Defendants had closed Exchange Street in front of the PSB to vehicular traffic.

38.    Plaintiff was on the sidewalk across the street from the PSB throughout the protest.

39.    At approximately 5:00 p.m., on the sidewalk near the parking lot across the street from PSB, RPD Officers and/or Sheriff's Deputies shot Plaintiff with pepper balls and sprayed her with other chemical weapons, including pepper spray and/or tear gas.

**Thursday September 3 to Friday September 4, 2020**

40.    Plaintiff was again assaulted and battered by RPD officers and/or Sheriff's Deputies on the night of Thursday, September 3 to Friday September 4, 2020 at the peaceful protest in the vicinity of the PSB.

41.    When she arrived, Exchange Street in front of the PSB had been closed to vehicular traffic by law enforcement.

42.    According to the New York Times: "People were sitting, singing, chanting, and eating pizza. At around 10:30 p.m., the dozen or so police officers who had been monitoring the demonstrators from behind a barricade were joined by around 20 reinforcements in riot gear. The

officers suddenly surged toward the barricade and began firing an irritant into the crowd. It was unclear what led them to do so."

43.     At approximately 10:30 p.m., in the vicinity of the parking lot across the street from PSB, Plaintiff was subjected to a large amount of chemicals from pepper spray and/or tear gas by RPD officers and/or Sheriff's Deputies.

44.     Thereafter, on September 4, 2020 at approximately 12:30-1:00 a.m., in the vicinity of the Center City Bridge, as Plaintiff was walking away from law enforcement, RPD officers and/or Sheriff's Deputies shot her in the back numerous times with pepper balls.

**Friday September 4 to Saturday September 5, 2020**

45.     On September 4, RPD officers and Sheriff's Deputies used the Court Street bridge to "kettle" hundreds of protesters, including Plaintiff, spray them with tear gas, and attack them with pepper balls – a scene tragically reminiscent of the 1965 "Bloody Sunday" attack on civil rights demonstrators on the Edmund Pettus Bridge in Selma, Alabama.

46.     When the RPD officers issued dispersal orders at on September 4 at approximately 10:43 p.m., Plaintiff was on the bridge.

47.     Less than 30 seconds after the RPD officers issued dispersal orders, an RPD Officer and/or Sheriff's Deputy shot Plaintiff in the face with a pepper ball, without cause or justification.

48.     Thereafter, on September 5, 2020 at approximately 12:30 a.m., on Court Street near the Court Street Parking Garage, Plaintiff was subjected to large amounts of tear gas.

**Night of Saturday September 5 to Sunday September 6, 2020**

49.     On the night of Saturday, September 5-6, 2020, Plaintiff was again assaulted and battered by RPD officers and/or Sheriff's Deputies at a peaceful protest in downtown Rochester.

50.     On September 5, 2020, at approximately 10:30 p.m., the RPD Officers and Sheriff's Deputies kettled and trapped Plaintiff and hundreds of other protesters at the intersection of Broad Street and Exchange Blvd.

51.     The RPD Officers and Sheriff's Deputies attacked Plaintiff and the other protesters with chemical weapons.

52.     On September 5 at approximately 10:30 p.m. at the intersection of Broad Street and Exchange Blvd, while she was standing on the sidewalk, Plaintiff was shot in the back several times with pepper balls.

53.     Plaintiff was also subjected to large amounts of tear gas and other chemical weapons during the night of September 5-6, 2020.

   C.   **Negligence of the City And RPD in Failing to Properly Train RPD Officers and On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Officers Who Used Excessive Force Against Protesters**.

54.     The violations of Plaintiffs' rights are attributable to the CITY and RPD's disregard of many years of notice, criticism, and other relevant data points, both internal and external, related to its unconstitutional policing of similar peaceful protests and peaceful demonstrations.

55.     Based on statements by City Officials and RPD command staff to date, no RPD officer has reported any fellow officer for their unlawful use of force and no RPD officers have been disciplined for their unlawful use of force on September 2-6, 2020.

56.     Since at least the 2009, the RPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies.

57.     Upon information and belief, the core training provided by the CITY related to protest response is based on crowd management and disorder control tactics for policing large-scale civil disorders and riots.

58.     According to the CITY's website, the RPD's Mobile Field Force (MFF) is a "specially trained and equipped team providing a rapid, organized and disciplined response to civil disorder [and] crowd control."

59.     The MFF was the RPD's primary unit tasked with policing the peaceful protests in the wake of George Floyd and Daniel Prude in May and September 2020.

60.     Upon information and belief, the MFF's training and guidelines treat peaceful protest and peaceful demonstrations as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, such as disorder control formations and mass use of chemical weapons.

61.     Such disperse and demoralize tactics have persisted through the present as exemplified by the experiences of Plaintiffs.

62.     Upon information and belief, the MFF's "civil disorder" training and guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as peaceful protests—only for large-scale civil disorders such as riots.

63.     However, neither the MFF's "civil disorder" training and guidelines, nor, upon information and belief, any related RPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies, such as peaceful protests and lawful demonstrations.

64.     For example, upon information and belief, there is virtually no RPD training— and certainly no meaningful RPD training—focusing on how to utilize the tactics described in

the MFF's "civil disorder" training and guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

65.     Many MFF members have histories of engaging in the kinds of misconduct complained of herein, among other places, by CRB complaints, PSS investigations and in lawsuits.

66.     Examples of the RPD's unreasonable and discriminatory use of force at prior lawful protests include:

- In October 2009, an anti-war protest in Rochester resulted in several physical confrontations, with two protesters receiving stitches at the hospital after RPD officers pushed them face-first to the ground, and 12 protesters arrested for exercising their First Amendment rights. The peaceful march, held in the early evening, was interrupted by approximately forty RPD vehicles. Within three minutes of giving the order to disperse, RPD officers began to shove and hit protesters with clubs and deploy pepper spray. Protesters described RPD officers wading through the crowd to pick out Black students to arrest. A press videographer who was filming one such arrest was wrestled to the ground by police and himself arrested.

- In May 2015, Katrina Perkins was protesting police brutality on a public street in a residential neighborhood, where two of her daughters and six of her grandchildren reside. Though Ms. Perkins was peacefully demonstrating, RPD officers violently seized and arrested her and then charged her with disorderly conduct and disruption. Those charges were dismissed two months later. Police brutality is a deeply personal

issue to Ms. Perkins, as her daughter Lashedica was the 13-year-old shot three times by former-Deputy Chief Simmons in 2005.

- In July 2016, in Rochester as across the nation, people took to the streets to uphold the sanctity of Black lives and call for an end to racist policing. In response, the RPD deployed, beat, shoved, and pepper sprayed protesters. As one described it: "I started to turn and they tackled me to the ground.…They're beating citizens for no reason whatsoever. I wasn't doing anything. I was taking pictures." RPD officers, in keeping with their pattern and practice, particularly targeted Black protesters with unlawful force, including Black journalists: Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Over the course of one weekend, Rochester had more arrests at its BLM protest (74) than the rest of the nation combined.

67.     Despite the wealth of evidence of RPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in RPD training as it relates to constitutionally compliant protest policing.

68.     Moreover, between a protest that occurred on May 30, 2020 and the September 2020 protests, the RPD quietly updated its departmental policy on usage of the Pepper Ball Launching System ("PLS"). Specifically, the Department amended the policy to allow officers on the patrol division to use the PLS. Prior to this amendment, only officers on the Special Weapons and Tactics ("SWAT") team were eligible to use PLS. The RPD did not update the policy in any other way.

69.    Under RPD General Order 630, an officer is ineligible to join the SWAT team if he has "any instance of sustained excessive force" or "serious" misconduct in his disciplinary history. The Patrol Division (or Mobile Field Force team) does not have any such eligibility requirement.

70.    On information and belief, the Department updated this policy to ensure more officers could (and would) be able to use the PLS in anticipation of protests after the suppressed footage of RPD officers killing Daniel Prude was released. By removing any "disciplinary history check," the Department knew or had reason to know that RPD officers would use excessive force when engaging with protesters—which they did.

71.    On information and belief, the CITY and the RPD failed to provide any training to RPD officers on how to use the PLS.

72.    Any training the CITY and the RPD provided to RPD officers on using the PLS was insufficient and inadequate.

73.    In summary, upon information and belief, the RPD's exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing peaceful protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of peaceful protests, let alone how to encourage or facilitate protests—despite having received clear notice that RPD policing of said protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates the City's negligence in failing to train and supervise RPD Officers in properly and lawfully policing protests to ensure that protesters' rights under the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights are not violated. As a result of the City's negligence, Plaintiff was injured and harmed, as described herein

D. **Negligence of Sheriff BAXTER in Failing to Properly Train Sheriff's Deputies On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Sheriff's Deputies Who Used Excessive Force Against Protesters**.

74.     Similarly, prior to 2020, BAXTER had received clear notice that peaceful demonstrations have occurred and will continue to occur in Monroe County, and that without proper training, his Deputy Sheriffs would violate individuals' constitutional rights and endanger the life and safety of protesters, such as Plaintiff.

75.     BAXTER has deliberately disregarded the fact that peaceful protests and peaceful demonstrations have occurred and will continue to occur in Monroe County, and instead has trained his Deputies that such lawful First Amendment activities constitute "civil disturbances" that mut be policed in the same manner as "violent mobs" or "riots."

76.     BAXTER, upon information and belief, took no steps to train his Sheriff's Deputies on lawfully policing protests and other First Amendment activities.

77.     Instead, BAXTER, pursuant to the County's Hazard Mitigation Plan, trained his Sheriff's Deputies that a "civil disturbance" is defined as both "peaceful demonstrations or acts of violence."

78.     The Hazard Mitigation Plan was in full force and effect at all times relevant herein.

79.     Upon information and belief, BAXTER is responsible for implementing the Hazard Mitigation Plan, and trains his Sheriff's Deputies in accordance with its mandates. Thus, BAXTER explicitly conflates peaceful protests and peaceful demonstration with violent riots.

80.     Upon information and belief, BAXTER does not provide any training to Sheriff's Deputies on drawing a meaningful distinction between "peaceful demonstrations" and "violent mobs". For example, in its "Hazard Mitigation Plan," the County states that, "Many civil unrest

incidents are spontaneous and can occur at any time, rendering prediction of probability of future occurrences difficult. When these incidents occur, they can become extremely disruptive and difficult to control. Assumedly, civil unrest incidents including marches, protests, demonstrations, and gatherings will continue to occur throughout Monroe County."

81.     According to the Hazard Mitigation Plan, peaceful demonstrates are discouraged because of the perceived negative impacts on property resources, real estate and the economy; again, this is a result of BAXTER falsely conflating "peaceful demonstrations" and peaceful protests with "acts of violence."

82.     Upon information and belief, BAXTER does not provide any training to Sheriff's Deputies on how to encourage and support individuals engaging in "peaceful demonstrations" to ensure that their constitutional rights are not violated by law enforcement officers.

83.     Upon information and belief, BAXTER does not provide any training to Sheriff's Deputies on making a meaningful distinction between how Sheriff's Deputies are trained and instructed on policing "peaceful demonstrations", "peaceful protests" versus "violent mobs" and riots.

84.     Instead, the Hazard Mitigation Plan states that, "[m]any protests intended to be peaceful demonstrations to the public and the government can escalate into general chaos." Thus, upon information and belief, BAXTER trains his Sheriff's Deputies to police peaceful demonstrations in the same manner as they would a violent mob.

85.     Like the RPD, upon information and belief, BAXTER trains Sheriff's Deputies exclusively on deterring, dispersing, and demoralizing protests and peaceful demonstrations.

86.     In June 2020, several Monroe County Legislators called on BAXTER to implement new protest training to ensure the safety of protesters at Black Lives Matter

demonstrations. The legislators drafted a letter to County Executive Adam Bello and BAXTER in which they made a number of requests related to public safety and the safety of protesters, and closed by stating, "Once again, we believe the safety of both protesters, motorists, and law enforcement is of the utmost importance. Right here in Monroe County and across the Nation, we have seen the negative results when leaders are reactionary rather than proactive. Please be sure that a plan is in place to ensure the mutual safety of all involved."

87.     BAXTER claimed the letter was a "political stunt" and refused to provide any specific details regarding how Sheriff's Deputies would ensure the safety of protesters during peaceful demonstrations.

88.     As a result of the BAXTER's negligence, Plaintiff was injured and harmed, as described herein.

## IV.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### Assault and Battery on July 5, 2020

### (Against CITY, QUINN, COUCH, WEBSTER)

89.     All preceding and subsequent paragraphs are incorporated by reference.

90.     QUINN, COUCH, WEBSTER and other RPD officers assaulted and battered Plaintiff on July 5, 2020.

91.     The types and levels of force Defendants used against Plaintiff were in contravention of, or inconsistent with, related policies and/or training.

92.     Plaintiff was not threatening the law enforcement officers or any other person at any time.

93.     By the aforedescribed conduct, defendants, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered

Plaintiff on July 5, 2020, when they, in a hostile and/or offensive manner struck Plaintiff without her consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiff and caused such battery.

94.     The RPD Officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

95.     The Defendant CITY, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

96.     At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by QUINN, COUCH, WEBSTER or other defendant RPD officers against Plaintiff.

97.     The actions of the RPD officers were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

98.     As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

<u>**SECOND CLAIM FOR RELIEF**</u>
**Excessive Force on July 5, 2020**
***Pursuant to 42 U.S.C. § 1983***
**(Against QUINN, COUCH, WEBSTER)**

99.     All preceding and subsequent paragraphs are incorporated by reference.

100.    Defendants' actions towards Plaintiff constitutes excessive force in violation of 4th and 14th Amendments of the United States Constitution and 42 U.S.C. § 1983.

101.    Defendants used force against Plaintiff that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them.

102.    It was objectively unreasonable for the RPD Officers to seize Plaintiff while she was standing on her own property.

103.    It was objectively unreasonable to body slam Plaintiff on the ground.

104.    The types and levels of force Defendants used against Plaintiff were in contravention of, or inconsistent with, related RPD policies and/or training.

105.    As a result of the acts and omissions of the RPD officers, Defendants deprived Plaintiff of federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

106.    The actions of the RPD officers were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

107.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

### THIRD CLAIM FOR RELIEF
**Unlawful Seizure / False Arrest on July 5, 2020**
***Pursuant to New York State Law***
**(Against CITY, QUINN, COUCH, WEBSTER)**

108.    All preceding and subsequent paragraphs are incorporated by reference.

109.    One or more of the defendant RPD officers, including but not limited to QUINN, COUCH, WEBSTER handcuffed and arrested Plaintiff.

110.    The arrest was made in the absence of a warrant for the arrest.

111.    The arrest was made in the absence of probable cause for the arrest.

112.    The Defendant RPD officers arrested Plaintiff without having exigent circumstances for doing so.

113.    There was no other authority for the arrest of Plaintiff.

114.    Plaintiff was conscious of the arrest.

115.    Plaintiff did not consent to the arrest.

116.    QUINN, COUCH, WEBSTER's actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

117.    The defendant RPD officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant City and the RPD, which are therefore responsible for their conduct.

118.    The Defendant City, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.*

119.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

### FOURTH CLAIM FOR RELIEF
**Unlawful Seizure / False Arrest on July 5, 2020**
*Pursuant to 42 U.S.C. § 1983*

**(Against QUINN, COUCH, WEBSTER)**

120.    All preceding and subsequent paragraphs are incorporated by reference.

121.    QUINN, COUCH, WEBSTER  and other RPD officers had no judicial warrant authorizing them to seize Mr. ANDREWS.

122.    QUINN, COUCH, WEBSTER and other RPD officers seized Plaintiff, restricting his freedom of movement, without privilege or lawful justification.

123.    Plaintiff was conscious of her confinements by Defendants.

124.    Plaintiff did not consent to being confined by Defendants.

125.    No reasonable officer would have believed they had reasonable or probable cause to seize, detain, or arrest Plaintiff.

126.    QUINN, COUCH, WEBSTER did not have individualized probable cause to seize, detain, or arrest Plaintiff.

127.    QUINN, COUCH, WEBSTER's actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

128.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

**FIFTH CLAIM FOR RELIEF**
**Evidence Fabrication / Denial Of Fair Trial**
***Pursuant to 42 U.S.C. § 1983***
**(Against QUINN, COUCH, WEBSTER)**

129.    All preceding and subsequent paragraphs are incorporated by reference.

130.    Defendants deliberately fabricated information in  police reports and other arrest paperwork that they knew was likely to influence a jury's verdict, forwarded that fabricated evidence to prosecutors, and Plaintiff suffered a deprivation of life, liberty or property as a result.

131.    Defendants' actions violated Plaintiff's rights pursuant to the Fifth and Fourteenth Amendments to the United States Constitution, to due process of law and to a fair trial, and as such, they are liable to plaintiff under 42 U.S.C. § 1983, for compensatory and punitive damages.

132.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer economic injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, economic damages, legal expenses and damages to their reputation and standing within the community.

133.    QUINN, COUCH, WEBSTER's actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

134.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

### SIXTH CLAIM FOR RELIEF
**Assault and Battery on September 2-6, 2020**
*Pursuant to New York State Law*
**(Against the CITY and Individual Defendants)**

135.   All preceding and subsequent paragraphs are incorporated by reference.

136.   RPD officers and/or Sheriff's Deputies battered Plaintiff on September 2-6, 2020 by subjecting her to various chemical weapons, including shooting her with pepper balls, pepper spraying her and subjecting her to tear gas.

137.   At no time was Plaintiff every threatening the law enforcement officers or any other person at any time.

138.   At no time was Plaintiff was committing any crime or violation.

139.   By the aforedescribed conduct, the RPD officers and/or Sheriff's Deputies, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered Plaintiff, when they, in a hostile and/or offensive manner struck Plaintiff without her consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiff and caused such battery.

140.   The RPD Officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

141.   The Defendant CITY, as the employer of the individual RPD Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

142.   At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by the Defendant RPD officers against Plaintiff.

143.    The actions of the RPD officers and/or Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

144.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

**SEVENTH CLAIM FOR RELIEF**
**Excessive Force on September 2-6, 2020**
***Pursuant to 42 U.S.C. § 1983***

145.    All preceding and subsequent paragraphs are incorporated by reference.

146.    The actions of the RPD Officers and/or Sheriff's Deputies towards Plaintiff on September 2-6, 2020 constitutes excessive force in violation of 4th and 14th Amendments of the United States Constitution and 42 U.S.C. § 1983.

147.    RPD Officers and/or Sheriff's Deputies used force against Plaintiff that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them.

148.    It was objectively unreasonable for the RPD Officers and/or Sheriff's Deputies to shoot Plaintiff with  pepper balls, pepper spray her, and subject her to tear gas on September 2-6, 2020.

149.    The force used against Plaintiff on September 2-6, 2020 constitutes a seizure under the 4th Amendment.

150.    The types and levels of force RPD Officers and/or Sheriff's Deputies used against Plaintiff were in contravention of, or inconsistent with, related policies and/or training, and good and accepted police practices.

151.    As a result of the acts and omissions of the RPD Officers and/or Sheriff's Deputies, Plaintiff was deprived of her of federal, state, and/or other legal rights; Plaintiff was

caused bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; Plaintiff was caused to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

152.    The actions of the RPD Officers and/or Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

153.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

### EIGHTH CLAIM FOR RELIEF
### First Amendment Infringements, Including First Amendment Retaliation
### *Pursuant to 42 U.S.C. § 1983*

154.    All preceding and subsequent paragraphs are incorporated by reference.

155.    In committing the acts and omissions complained of herein,  Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiff of the rights protected by the First Amendment to the United States Constitution on July 5, 2020 and September 2-6, 2020.

156.    Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to subjecting Plaintiff to excessive force, in arresting and prosecuting plaintiff, in selectively enforcing laws and regulations against Plaintiff, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

157.    Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

158.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

159.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

160.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

161.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

### NINTH CLAIM FOR RELIEF
**Failure To Intervene**
*Pursuant to 42 U.S.C. § 1983*

162.    All preceding and subsequent paragraphs are incorporated by reference.

163.    The RPD officers had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of her constitutional rights by the other RPD officers on July 5, 2020.

164.    The individual defendants all had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of her constitutional rights by the other Defendant RPD Officers and/or Sheriff's Deputies on September 2-6, 2020.

165.    The individual defendants failed to intervene on Plaintiff's behalf despite having had realistic opportunities to do so.

166.    The individual defendants failed to intervene on Plaintiff's behalf despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

167.    As a result of the aforementioned conduct of the individual defendants, Plaintiff's constitutional rights were violated.

168.     As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

169.     Defendant RPD officers' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## TENTH CLAIM FOR RELIEF

### Negligence

### (Against BAXTER)

170.     All preceding and subsequent paragraphs are incorporated by reference.

171.     Defendant BAXTER was negligent in the training, supervision and discipline of the Defendant Sheriff's Deputies, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons; or the training they were provided was inadequate.

172.     BAXTER had a duty to ensure that his Sheriff's Deputies were properly trained in policing peaceful protests and other large demonstrations, to keep the participants safe promote First Amendment expression.

173.     BAXTER knew or should have known that the Hazard Mitigation Plan conflated peaceful protests and demonstrations with violent mobs and riots, and that in the absence of proper training, his Sheriff's Deputies would use unreasonable and excessive force against peaceful demonstrators.

174.     BAXTER knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, including menstrual irregularities and infertility.

175.    BAXTER breached his duty to keep demonstrators safe by, among other things, training his Sheriff's Deputies to police peaceful demonstrations in the same manner as they would police violent mobs.

176.    BAXTER breached his duty to keep demonstrators safe by, among other things, training his Sheriff's Deputies to use chemical weapons indiscriminately against protesters.

177.    BAXTER breached his duty to keep demonstrators safe by, among other things, failing to train his Sheriff's Deputies on their duty to intervene to prevent the violation of protesters rights by other Sheriff's Deputies, RPD officers and/or other law enforcement officials.

178.    BAXTER breached his duty to keep demonstrators safe by, among other things, training his Sheriff's Deputies to that they could shoot pepper balls and other "less-than-lethal" projectiles at protesters' heads.

179.    BAXTER breached his duty to keep demonstrators safe by, among other things, training Sheriff's Deputies to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

180.    BAXTER breached his duty to keep demonstrators safe by all other actions detailed herein.

181.    Plaintiff's injuries were a direct and proximate result BAXTER negligently training his deputies in how to lawfully police First Amendment activities.

182.    Moreover, despite their use of extreme and excessive violence against protesters on September 2-6, 2020, BAXTER was negligent failing to supervise or discipline any of his

Sheriff's Deputies related to any force used protesters on those nights prior to Plaintiff's injuries. BAXTER's negligence was the direct and proximate cause of Plaintiff's injuries.

183.    As a result, Plaintiff sustained damages, including menstrual irregularities, in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

## ELEVENTH CLAIM FOR RELIEF

### Negligence

### (Against the CITY)

184.    All preceding and subsequent paragraphs are incorporated by reference.

185.    Defendant CITY was negligent in the training, supervision and discipline of the Defendant RPD officers, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons; or the training they were provided was inadequate.

186.    The CITY had a duty to ensure that RPD officers were properly trained in policing peaceful protests and other large demonstrations, to keep the participants safe promote First Amendment expression.

187.    The CITY knew or should have known that its training was inadequate; that in the past, numerous RPD officers had seriously injured peaceful demonstrators; and that in the absence of proper training, his RPD officers would use unreasonable and excessive force against peaceful demonstrators.

188.    The CITY knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, including menstrual irregularities and infertility.

189.   The CITY breached his duty to keep demonstrators safe on September 2-6, 2020 by, among other things, training RPD officers to police peaceful demonstrations in the same manner as they would police violent mobs.

190.   The CITY breached its duty to keep demonstrators safe by, among other things, training RPD officers to use chemical weapons indiscriminately against protesters.

191.   The CITY breached its duty to keep demonstrators safe by, among other things, training RPD officers to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

192.   The CITY breached his duty to keep demonstrators safe by, among other things, failing to train RPD officers on their duty to intervene to prevent the violation of protesters rights by other RPD officers, Sheriff's Deputies, and/or other law enforcement officials.

193.   The CITY breached his duty to keep demonstrators safe by all other actions detailed herein.

194.   Plaintiff's injuries were a direct and proximate result of the CITY negligently training RPD officers in how to lawfully police First Amendment activities.

195.   Moreover, despite their use of extreme and excessive violence against protesters on September 2-6, 2020, the CITY was negligent failing to supervise or discipline any of RPD officers related to any force used protesters on those nights prior to Plaintiff's injuries. The CITY's negligence was the direct and proximate cause of Plaintiff's injuries.

196.   As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

## TWELFTH CLAIM FOR RELIEF

### Negligence

### (Against the Individual Defendants)

197.    All preceding and subsequent paragraphs are incorporated by reference.

198.    The Defendant RPD officers and Sheriff's Deputies, their agents, servants, employees, officers and deputies were negligent using the "less lethal" military grade weapons and chemical weapons against Plaintiff on September 2-6, 2020, which was the direct and proximate cause of Plaintiff's injuries.

199.    The Defendant RPD officers and Sheriff's Deputies had a duty to permit the protesters to engage in First Amendment Activities and to protect them from harm or physical violence.

200.    The Defendant RPD officers and Sheriff's Deputies had a duty to not use force against any individual protester in the absence of individualized cause or legal justification for the use of force.

201.    The Defendant RPD officers and Sheriff's Deputies breached that duty by firing "less lethal" munitions and chemical weapons into "groups" of protesters based on perceived "group conduct," without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

202.    The breach of that duty by the Defendant RPD officers and Sheriff's Deputies was the direct and proximately cause of Plaintiff's serious injuries described herein, including her menstrual irregularities.

203.    Defendant RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

204. As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

## THIRTEENTH CLAIM FOR RELIEF

### Respondeat Superior

### (Against the City)

205. All preceding and subsequent paragraphs are incorporated by reference.

206. The RPD officers, and other individuals who joined with them in their wrongful conduct, were, at all times relevant to this Count, were employees and agents of the Defendant CITY. Each of those defendants and persons was acting within the scope of his or her employment, and their acts and omissions, as alleged above, are therefore directly chargeable to the CITY under the doctrine of *respondeat superior.*

## FOURTEENTH CLAIM FOR RELIEF:
### Municipal Liability

### *Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's First, Fourth and Fourteenth Amendment Rights*

207. All preceding and subsequent paragraphs are incorporated by reference.

208. All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed RPD officers pursuant to: (a) formal policies, rules, and procedures of Defendant CITY; (b) actions and decisions by Defendant CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by CITY policymaking officials; (d) Defendant CITY's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the CITY's failures, and the failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite

full knowledge of the their wrongful acts against Plaintiff and other protesters, as described

herein.

209.     As a result, Plaintiff sustained damages in an amount in excess of the

jurisdictional limits of all the lower Courts of the State of New York.

**WHEREFORE** and in light of the foregoing, Plaintiff demands judgment on all

claims for relief:

a.     Empanel a jury;

b.     Award compensatory and punitive damages;

c.     The Plaintiff demands the foregoing relief jointly and severally against all of

the defendants in an amount in excess of the jurisdiction of all lower Courts,

except that the punitive damages demands are, as a matter of law, not

recoverable against a municipality and therefore are not made against the City;

d.     Award costs and attorney's fees pursuant to 42 U.S.C. § 1988; and

e.     Such other and further relief as the court may deem just and proper.

Dated: New York, New York          Respectfully Submitted,
September 1, 2021

ROTH & ROTH, LLP.

Elliot Dolby Shields
Co-counsel for Plaintiffs
192 Lexington Avenue, Suite 802
New York, New York 10024
(212) 425-1020

Easton Thompson Kasperek Shiffrin LLP
Donald Thompson
Co-counsel for Plaintiffs
16 West Main Street, Suite 243
Rochester, New York 14614
Ph: (585) 423-8290

## ATTORNEY'S VERIFICATION

**ELLIOT DOLBY SHIELDS,** an attorney duly admitted to practice before the Courts of the State of New York, affirms the following to be true under the penalties of perjury:

I am associated with Roth & Roth, LLP, attorneys for the Plaintiff, I have read the annexed **VERIFIED COMPLAINT** and know the contents thereof, based on the files maintained in my office, and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true. My belief, as to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent information contained in my files. This verification is made by me and not the Plaintiff because I maintain my office in a different county from where the Plaintiff resides.

DATED: New York, New York
         September 1, 2021

ELLIOT DOLBY SHIELDS